TROMBLEY v. McAFEE.

1. MASTER AND SERVANT — PERSONAL INJURIES — NEGLIGENCE OF
   MASTER—SAFETY OF APPLIANCES—KNOWLEDGE—QUESTION FOR
   JURY.

   In an action by a servant for personal injuries, received while
   attempting to hang up a belt away from a line shaft to pre-
   vent its being burned by the motion of the shaft, plaintiff
   claimed that his hand was caught by the frayed ends of a
   rope which had been wound around the shaft to form a tem-
   porary pulley, and there was evidence tending to show that
   within defendants' knowledge plaintiff was accustomed to
   suspend the running of his machine by removing the belt
   from the pulley on the main shaft and hanging it up in the
   manner indicated, whence defendants knew that he was ex-
   posed to such dangers as might result in coming in contact
   with any object unknown to him, and which they had rea-
   son to apprehend at that place. *Held*, that whether the de-
   fendants might reasonably have apprehended that the rope
   pulley, which for a long time before the accident was per-
   forming no office, might be expected to unwind so that its
   loose ends would extend a distance from the shaft when re-
   volving, was a question for the jury.

2. SAME—CAUSE OF INJURY—QUESTION FOR JURY.

   Evidence examined, and *held*, that whether the extended ends
   of the rope used for a pulley caught plaintiff's hand, causing
   the injury, was a question for the jury.

3. SAME—ASSUMPTION OF RISK—VIOLATION OF STATUTORY DUTY.

   Where a servant with the knowledge of his master is accus-
   tomed and is required to suspend the operation of his ma-
   chine by removing the belt connecting it with the main shaft
   and tying the belt up away from the shaft, and is required to
   adopt that means by reason of the master's violation of the
   statutory duty to provide loose pulleys or other adequate
   means of placing the machine out of commission, it cannot
   be said that he assumes any risk of injury not reasonably ob-
   vious to him at the time.

4. SAME—CONTRIBUTORY NEGLIGENCE.

   Contributory negligence of plaintiff may be a defense to an
   action against an employer for personal injuries notwith-
   standing a violation on his part of a statutory duty which
   deprives him of the defense of assumption of risk.

Error to Wexford; Chittenden, J. Submitted February 21, 1908. (Docket No. 89.) Decided May 1, 1908.

Case by Joseph L. Trombley against Andrew McAfee and George McAfee for personal injuries. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Reversed.

*De Vere Hall* (*D. E. McIntyre*, of counsel), for appellant.

*I. C. Wheeler* and *Charles A. Withey*, for appellee.

Montgomery, J. The plaintiff brings this action to recover from the defendants damages for an injury sustained by him on March 16, 1906, while in defendants' employ in a heading mill at Manton, the injury resulting in the loss of both his right arm and his right leg. The plaintiff, a man about 30 years of age, was employed to cut the heads of barrels in a machine called a turner. The defendants employed 30 to 35 men in the mill, the room in which plaintiff was employed being about 30 feet in length, north and south, by 20 feet in width, east and west, the ceiling being 8 feet in height. In addition to the turner, the room contained a planer, a jointer, and a buzz planer. The line shaft extended the full width of this room in the north part, about 6½ feet from the floor, and on it were four tight pulleys driving the turner, the planer, the jointer and the buzz planer respectively. The turner was located in the southeast part of the room about 20 feet from the line shaft, and connected with it by two belts, one extending from the turner to an intermediate counter-shaft, and the other from such counter-shaft to the line shaft. There was also on the counter-shaft a loose pulley at the east end. The counter-shaft was 1¾ inches in diameter and 3½ feet in length, suspended from two iron hangers about 7½ feet from the floor. The office of the loose pulley was to stop the machine with which it was connected without stopping the other machinery in

the factory. This was done by passing the belt from the pulley over which it ran to the loose pulley, and when it was desired to start the machine again, the belt was forced back from the loose pulley to the tight pulley. The loose pulley in question was designed for use in stopping the turner.

The defendant George McAfee was the superintendent, general manager and foreman of the mill, and at different times while plaintiff was employed, the defendant Andrew McAfee, his son Don and one Henry Orcut, millwright, acted as foreman and gave directions. The plaintiff's testimony tended to show that he had no authority over any others in the mill, and that his duty was to turn out heading in the quality and quantity desired.

The testimony offered on behalf of the plaintiff tended to show that the loose pulley in question was out of order and had been for a considerable time; that it rattled so as to cause apprehension that it might fly loose from the shaft and cause injury; that plaintiff was directed to babbitt it so as to make it tighter on the shaft; that he did this a few days before the injury occurred to him. In babbitting the pulley onto the shaft, the plaintiff evidently got it too tight and the defendant George McAfee took a sledge hammer and broke it off. Another pulley with three-inch bore was tried, but that didn't work, according to the testimony of the plaintiff, for the reason that the belt would not stay onto the loose pulley, but would come back onto the tight pulley as before. There was no belt shifter. It appears that a belt shifter serves two purposes, one to make the actual shift of the belt from the tight to the loose pulley, and the other to hold the belt in position after it is shifted.

It appeared that something like a year before the injury, a worm feed to the machine operated by plaintiff wore out, and a new one was sent for. In order to operate the machine until the new appliance reached them, defendants put in an independent counter-shaft over the header and drove it directly from the main line shaft by

a belt running from the pulley on the counter-shaft over the machine to a pulley on the main line, made by winding a half-inch tarred rope around the shaft, this being a mere temporary contrivance not designed for permanent use.    This pulley answered the purpose, and plaintiff used it until a new worm came, which was a week or more. After the worm came, the temporary device was discontinued, but the rope pulley was left on the main line shaft. Plaintiff knew of the fact that this rope pulley was there, but he testified that he did not know that it had become frayed, and that the ends hung down.

There was testimony from which the jury might have inferred that in the absence of a shifting device which would hold the belt to the loose pulley, and in view of the testimony of the plaintiff that the belt would not remain on the loose pulley which was on the shaft at the time, it was a proper method to throw the belt off the main line pulley and loop it up to hold it away from the shaft. There was testimony that the plaintiff had been accustomed to do this, and at first he had required the engine to slow down when he wanted to throw the belt off the main line pulley, but that the defendants ordered the discontinuance of that practice and told plaintiff that he must throw the belt while the machinery was in motion, and that thereafter the practice was to throw it without slowing down.

On the day in question, the plaintiff had placed a barrel near the shaft, had stepped up on the head of the barrel, had thrown the belt off the main line pulley, and was in the act of fastening it up with a string to keep it from burning from the motion of the shaft, when he became involved with the shaft and was seriously injured.    The declaration avers that the manner in which he became involved with this shaft was by being caught with the frayed ends of the rope which had been used in making the rope pulley, which frayed ends were hanging down, and of which plaintiff was ignorant, and which he could not see

when the shaft was in motion. The plaintiff testifies that he was not aware of the fact that the frayed ends of this rope were hanging down. Other witnesses testify that they saw the ends hanging down from time to time. The circuit judge directed a verdict for the defendants upon the ground that the testimony failed to show that the plaintiff was caught by the hanging ends of the rope.

The theory of the plaintiff is that, as the statute, section 8 of Act No. 113 of the Public Acts of 1901, defining the duty of factory owners, provides that the "belting shall be provided with proper safeguards, and wherever possible machinery shall be provided with loose pulleys," this statute required that the employer, in the exercise of the duty of providing loose pulleys, shall observe a reasonable degree of care, and shall provide one reasonably fit for use; that a failure in this regard is negligence per se; and that the employé does not assume the risk resulting from the violation by the employer of a statutory duty imposed for the employé's protection.

It is further contended by plaintiff and appellant that, the defendants having increased the ordinary risk of doing the work, the duty rested upon them of informing the plaintiff of the increased risk, and that, the defendants having placed this rope on the shaft and left it there, plaintiff could defer to their implied assurance that no unusual danger would be occasioned thereby.

The defendants, on the other hand, assert that the plaintiff knew that there was no shifter, and that the necessity for making use of the other method of looping up this belt was occasioned not because of the inadequacy of the loose pulley, but because of the want of a shifter; that the pulley would have answered its purpose had there been a shifter performing the office not only of shifting the belts but of holding the belt on the loose pulley after it was placed there; and that as there is no testimony tending to show that the shifter was required by the factory inspector, negligence cannot be imputed to the defendants, as a matter of law, for failure to provide such shifter.

We think that a general discussion of the duty owing by the defendants in this case would not be profitable, for the reason that there was testimony which tended to show that, with the knowledge of the defendants, plaintiff was using, and was expected to use, the method employed on the occasion in question in suspending the use of his machine; that this had been commonly done; and that defendants recognized the inadequacy of the provision made for the loose pulley; and knowing that plaintiff was accustomed to suspend the running of his machine by removing the belt from the main shaft and catching it up in the manner indicated, the defendants knew that he was exposed to such dangers as might result in coming in contact with any object unknown to him, and which they had reason to apprehend at that place. We think it was a question for the jury as to whether the defendants might reasonably have apprehended that this rope pulley, which for a long time before the accident was performing no office, might be expected to unwind so that its loose ends would extend a distance from the shaft when revolving.

The question remains as to whether there was any testimony from which the jury would have been justified in inferring that contact with the loose ends of the rope was what in fact caused the injury to the plaintiff. Plaintiff's testimony upon this point we quote at length:

"When I got up there I intended to loop the belt off the shaft.

"*Q*. And what did you do?

"*A*. I reached for it and got caught by the hand.

"*Q*. Which hand did you reach?

"*A*. My right hand.

"*Q*. Did you get hold of the belt?

"*A*. No, sir, I didn't.

"*Q*. How close to your hand did the belt get?

"*A*. I got just about touching it, I should judge.

"*Q*. You say you should judge that your hand had almost reached the belt?

"*A*. Yes, sir.

"*Q.* Then what took place, what happened then?

"*A.* I got caught by my right hand.

"*Q.* What caught you?

• "*A.* The rope.

"*Q.* Well, what happened to you?

"*A.* I went around the shaft.    *    *    *

"*Q.* Now, you say when you reached over for the belt something caught your hand?

"*A.* Yes, the rope caught my hand.

"*Q.* How do you know it was the rope?

"*A.* Because I felt it, felt something take hold of me, I felt it catch me; it jerked me quicker than I had time to jerk.

"*Q.* How could you tell in that instant of time by the feeling that it was the rope that caught your hand?

"*A.* Well, I felt it catch me—I knew it was the rope.

"*Q.* Well, that was your opinion, that you got caught by the rope?

"*A.* Nothing else could catch me there.

"*Q.* That is what makes you think it?

"*A.* No, I felt it grab me, whatever it was, and I know it was not the belt because I wasn't near enough to it, and I felt it pull me and it fetched me up against the pulley and broke my ribs.

"*Q.* But you don't think it was the belt?

"*A.* No, because I hadn't got hold of the belt yet; I was just reaching for it.

"*Q.* Well, had you got hold of the rope?

"*A.* Which rope?

"*Q.* That rope on the shaft; you say you hadn't got hold of the belt yet, had you got hold of the rope?

"*A.* No, the rope got hold of me.

"*Q.* That is what made you think about it?

"*A.* Yes, sir.   I know.

"*Q.* Did you see the rope then?

"*A.* No, sir, or else I wouldn't have put my hand there.

"*Q.* But you knew it was there?

"*A.* Yes, sir."

This testimony, when taken in connection with the testimony of other witnesses, that the ends of the rope were at times swinging away from the shaft, we think, leaves it open to the jury to find that it was such extended end of the rope that caught the plaintiff's hand. It is true that the word "rope" as used in this extract might have

referred to the rope pulley, but it is a fair construction to say that the witness meant the rope itself, and that it caught around his hand while he was engaged in this work. We think this presented a question for the jury.

If the plaintiff, in adopting this method of tying up the belt, was required to do so because of defendants' failure in the performance of a statutory duty, or their failure in providing other adequate means of putting his machine out of commission, and this with the knowledge of the defendants, it certainly cannot be said that he assumed any risk not reasonably obvious to him at the time. It is true that any act of contributory negligence would still constitute a bar to plaintiff's recovery. But the question of whether he had knowledge that this rope pulley had in fact thrown out these strands, or whether he should reasonably have apprehended such a condition, would be a question for the jury. Clearly, if he did know, or if as a reasonable man he should have apprehended such a condition, he would be guilty of contributory negligence in getting within reach of these while tying up the belt. If he did not, the question of whether he acted with reasonable prudence would be likewise a question for the jury.

The judgment is reversed, and a new trial ordered.

GRANT, C. J., and BLAIR, OSTRANDER, and MOORE, JJ., concurred.